**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**

| | |
|---|---|
| ADVANCED GROUND INFORMATION SYSTEMS, INC., | |
| Plaintiff, | CIVIL ACTION NO. 9:14-cv-80651-DMM |
| v. | JURY TRIAL DEMANDED |
| LIFE360, INC., | |
| Defendant. | |

**<u>LIFE360'S RULE 50(a) MOTION FOR JUDGMENT AS A MATTER OF LAW</u>**

Defendant Life360, Inc. ("Life360") respectfully moves this Court to enter Judgment as a Matter of Law in its favor, pursuant to Federal Rule of Civil Procedure 50(a). In support of its Motion, Life360 presents the following grounds.

## I.   INTRODUCTION

Plaintiff Advanced Ground Information Systems, Inc. ("AGIS") has now been fully heard on its infringement claims based on U.S. Patent Nos. 7,031,728 ("the '728 patent," Tr. Ex. PTX-901), 7,672,681 ("the '681 patent,"Tr. Ex. PTX-902), 7,764,954 ("the '954 patent," Tr. Ex. PTX-903), and 8,126,441 ("the '441 patent," Tr. Ex. PTX-904) against Life360.  AGIS did not present legally sufficient evidence for a reasonable jury to find infringement of any of the Asserted Claims.[1]   Nor did AGIS present legally sufficient evidence to rebut Life360's clear and convincing evidence that the Asserted Claims are invalid under 35 U.S.C. §§ 112 and 103. Finally, AGIS presented no legally sufficient evidence to support its claim for damages amounting to $ 3 million.  Consequently, this Court should grant judgment as a matter of law ("JMOL") in favor of Life360.  FED. R. CIV. P. 50(a)(2).

## II.   LEGAL STANDARD

JMOL is appropriate when "a reasonable jury would not have a legally sufficient evidentiary basis to find for [a] party on [an] issue."  Fed. R. Civ. P. 50(a)(1). To avoid JMOL, "'the nonmoving party must provide more than a scintilla of evidence that there is a substantial conflict in evidence to support a jury question.'" *Mee Indus. v. Dow Chem. Co.*, 608 F.3d 1202, 1211 (11th Cir. 2010) (quoting *Berman v. Orkin Exterminating Co.*, 160 F.3d 697, 701 (11th Cir. 1998).  "The question is not whether there is literally no evidence supporting the party against whom the motion is directed, but whether there is evidence upon which the jury might *reasonably* find a verdict for that party." 9A Wright & Miller, Federal Practice and Procedure, § 2254.

Conclusory expert testimony does not qualify as substantial evidence. *See Iovate HealthSciences, Inc. v. Vio-Engineered Supplements & Nutrition, Inc.*, 586 F.3d 1376, 1381-82 (Fed. Cir. 2009). Likewise, "when an expert opinion is not supported by sufficient facts to validate it in the eyes of the law, or when indisputable record facts contradict or otherwise render

---

[1] AGIS asserted the following claims at trial: 7 ('728 Patent), 1 ('681 Patent), 1 ('954 Patent), and 5 ('441 Patent).

the opinion unreasonable, it cannot support a jury's verdict." *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993).

The question of infringement must not be submitted to the jury unless there is "substantial evidence that each step of the claimed invention is performed by the defendants." *Pharmastem Therapeutics, Inc. v. Viacell, Inc.*, 491 F.3d 1342, 1381 (Fed. Cir. 2007); *see also Elkay Mfg. Co. v. Ebco Mfg. Co.*, 192 F.3d 973, 980-981 (Fed. Cir. 1999) ("Judgment as a matter of law of no literal infringement is appropriate if no reasonable fact finder could determine that the accused devices meet every limitation of the properly construed claims.").

A court must grant judgment as a matter of law on invalidity when the defendant presents evidence that the jury would not be at liberty to disbelieve and invalidity is the only reasonable conclusion. *Nobelpharma Ab v. Implant Innovations*, 141 F.3d 1059, 1065 (Fed. Cir. 1998).

Damages calculations that are "arbitrary" and "unrelated to the facts of the case" are "unreliable" and "irrelevant" as a matter of law, and thus cannot support a jury's damages verdict. *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1315, 1318 (Fed. Cir. 2011). A damages verdict cannot be supported by legally incompetent expert testimony. *Brooke Group*, 509 U.S. at 242.

## II.  ARGUMENT

### A. Life360 Does Not Infringe as a Matter of Law

#### 1. No Single User of the Life360 App Performs all the Claimed Steps

As was explained in detail in Life360's motion for summary judgment (DE 101, hereby incorporated by reference), various claim steps require performance in "each" phone, but AGIS' theory of infringement posits that "a [single] user" performs all steps, including those steps performed on multiple user's phones. *See, e.g.,* 3/10/15 Trial Tr., at 67:15-19 (Dr. Carbonell summarizing his opinion that "a user" practices all claim limitations); 68:17-20. For the reasons explained in Life360's motion and reply brief (DE 125), and those below, this theory of infringement fails to satisfy the requisite direction-or-control standard where multiple users' actions combine to perform, and therefore cannot establish direct infringement as a matter of law.

To establish direct infringement of a method claim, the accused direct infringer must, "either personally or through another acting under his direction of control," perform each and every step. *Aristocrat Techs. Austl. PTY Ltd. v. Int'l Game Tech.*, 709 F.3d 1348, 1362 (Fed.

3

Cir. 2013).  Importantly, "[d]irect infringement has not been extended to cases in which multiple independent parties perform the steps of the method claim."  *Id.*  The "control or direction standard is satisfied in situations where the law would traditionally hold the accused direct infringer vicariously liable for the acts committed by another party that are required to complete performance of a claimed method."  *Muniauction, Inc. v. Thomson Corp.*, 532 F.3d 1318, 1330 (Fed. Cir. 2008).  Mere "'arms-length cooperation'" is insufficient to establish direct infringement where performance of the steps is divided among multiple individuals.  *Id.* at 1329.  Here, the Court has already questioned AGIS' ability to prevail in light of this divided infringement precedent.  3/11/15 Trial Tr., at 154:1-9 (citing *Limelight Networks v. Akamai Technologies,* 134 S. Ct. 2111 (2014)).

Proof of non-infringement exists, for example, in the following pieces of testimony by Life360's expert and the corresponding admissions by AGIS' expert, which reveal that the associated claim steps are *not* performed by a single user, nor are the steps performed by each user under the direction or control of a single user:[2]

| Claim(s) & Patent(s) | Claim Step | Relevant Testimony |
|---|---|---|
| 7 ('728) 1 ('681) | "**providing and storing** *in each of the participant cellular phones* one or more cellular phone telephone numbers" | 3/10/15 Trial Tr., at 70:14-19 ("Q…do you agree with me that that means in the phones of every member of the circle? A: Yes").  *See also* 3/10/15 Trial Tr., at 80:14-18; 81:7-18.<br><br>3/10/15 Trial Tr., at 85:1-6 ("Q. Does there have to be a phone number? A. It has to be an identifier, at least a phone number or an e-mail. Q. Could I use an e-mail or could you use an e-mail instead of a phone number to invite me? A. Yes.").<br><br>3/10/15 Trial Tr., at 85:8-17 ("Now, do I have the option when I am agreeing to join the circle and downloading it, to either accept the phone number that you have, put in an alternate phone number, have no phone number, is that something that I can do on my end?  A. On your end, you can modify the information associated with your symbol, with your soft switch so that you could override the information that was transmitted to you. Q. And |

---

[2] Except where indicated otherwise the quoted testimony in this chart is from AGIS' expert, Dr. Carbonell.

| | | then when I accept that, that is then stored in my phone, correct? A. Yes, it is.") |
|---|---|---|
| | | *See also* 3/11/15 Trial Tr. (rough), at 206:5-7 (Ed Tittel); 3/11/15 Trial Tr. at 210:16-211:15 ("the number that could be provided in that invitation is a suggested number, and not a final record number, which actually doesn't get finalized until the user registers and joins, so that the number actually has to go to the server before it can be pushed down to the individual cellphones in the circle."); *id.* at 211:11-13 ("there is no facility in the Life360 system for one user to store something on another user's cellphone."). |
| | | 3/11/15 Trial Tr. at 136:3-137:7 (Alex Haro) ("So the next step once you click on accept invite, that actually doesn't do anything. Just clicking on the link takes you to a web page. And unlike some of the other testimony we may have already heard, that in itself does not do anything . . . I am free to change my name, I am free to change my e-mail, I'm free to change the phone number that you suggested for me."). |
| 7 ('728) <br> 1 ('681) | "**providing** . . . calling software *in each cellular phone*" | 3/10/15 Trial Tr., at 88:16-19 ("Q:…would you agree with me that that step requires the provision of this software in every cell phone in the circle? A. That is correct.") |
| | | 3/10/15 Trial Tr., at 89:22-90:2 ("In order for that software to get on their phones, they would have to basically accept the invitation, the link that you provided, and then follow through the additional steps of downloading, accepting the terms."); *see also id.* at 90:3-10. |
| | | *See also* 3/11/15 Trial Tr. (rough), at 207:10-209:5 (Ed Tittel). |
| | | 3/11/15 Trial Tr. at 130:20-132:13 (Alex Haro) ("Q. So just by virtue of me sending you an invitation, you don't have to accept my invitation? A. No. Like I said, only about 15 percent of them ever do get accepted."). |
| | | 3/11/15 Trial Tr. at 128:4-17 ("You have to provide the credentials and actually authorize that download. Then the download will happen and you have to go and find an app, like any other app |

| | | |
|---|---|---|
| | | you guys may have used. You click on the app. From there you are not a Life360 user yet. You have to fully sign up."). |
| 1 ('954) | "**providing** _each cellular/PDA/GPS phone_ with a software application program and database" | 3/10/15 Trial Tr., at 105:19-22 ("Q. Is this essentially the same limitation that we discussed in the 728, and 681 patent of the software being provided to each phone in the circle? A. It is.")<br><br>_See also_ 3/10/15 Trial Tr., at 88:16-19; 89:22-90:10.<br><br>_See also_ 3/11/15 Trial Tr., at 215:20-216:21 (Ed Tittel).<br><br>_See also supra_ re "providing . . . calling software in each cellular phone" step |
| 1 ('954) | "**displaying** _on each cell phone display_ one or more symbols representing the users in the network" | 3/10/15 Trial Tr., at 109:13-16 ("Q: Would you agree with me that the software that does the actual act of displaying is part of the Life360 app? A. The software that draws the symbols in a particular location, yes, of course.")<br><br>3/10/15 Trial Tr. at 110:18-24 ("Q. However, this administrative user has absolutely no impact on where this person's dot is showing up on my screen, do they? A. No.")<br><br>3/11/15 Trial Tr. at 141:7-13 (Alex Haro) ("nothing is ever transmitted to you unless you choose to go into the foreground. So it is only once you go into the foreground that your phone then asks the Life360 servers, hey, give me the latest information . . . only at that moment where you have opened in the foreground do things get synced up and you learn about my location."); _id._ at 142:5-22 ("You can could also turn off GPS and location. . . .  If your phone is off, Life360 is not running, we can't do anything about it."); _id._ at 142:11-13 ("if you turn location off, then we just continue to stop working, we can't send location to Life360 servers at all"). |
| 4 ('441) | "**displaying**, _on the touch display screen of each communication device_ . . . at least the identity data and the location data" | 3/10/15 Trial Tr., at 126:16-21 ("it's your testimony that this is satisfied by a single administrative user of the Life360 app, correct?...A: Correct")<br><br>3/10/15 Trial Tr., at 127:21-128:20 ("yes, a person moving around only has their icon or their symbol |

| | | |
|---|---|---|
| | | moving around"). |
| | | 3/11/15 Trial Tr., at 226:20-227:19 (Ed Tittel) |
| | | 3/11/15 Trial Tr. at 141:7-13 (Alex Haro) ("nothing is ever transmitted to you unless you choose to go into the foreground. So it is only once you go into the foreground that your phone then asks the Life360 servers, hey, give me the latest information . . . . only at that moment where you have opened in the foreground do things get synced up and you learn about my location."); *id.* at 142:5-22 ("You can could also turn off GPS and location. . . .  If your phone is off, Life360 is not running, we can't do anything about it."); *id.* at 142:11-13 ("if you turn location off, then we just continue to stop working, we can't send location to Life360 servers at all"). |
| 4 ('441) | "*each network participant* **automatically transmitting** . . . at least its identity and location data" | 3/10/15 Trial Tr., at 121:5-10 ("Q. Do you agree with me that this limitation requires each network participant to automatically transmit, correct? A. That's correct. Q. So we're talking about every one of the phones in the circle must automatically transmit? A. Yes.") |
| | | 3/10/15 Trial Tr., at 121:5-122:2 ("Would you agree with me that each one of the phones in the circle is individually transmitting to the Life360 server?  A. That's correct."). |
| | | *See also* 3/10/15 Trial Tr., at 121:24-122:2. |
| | | *See also* 3/11/15 Trial Tr. at 228:11-229:9 (Ed Tittel) ("one user on one handset cannot influence or deliver or supply information on another handset in the Life360 network"); |
| | | 3/11/15 Trial Tr. at 142:11-13 (Alex Haro) ("if you turn location off, then we just continue to stop working, we can't send location to Life360 servers at all"). |
| 4 ('441) | "each time network participant data is received, *the private remote server* automatically transmitting  to each of the other devices" | 3/10/15 Trial Tr., at 125:23-126:3 (Q: …This transmission is … individually going from the Life360 server to each phone, in the circle, correct? A:…Yes, that's correct"); 126:4-6 ("Q. And was your testimony -- this is a yes or no -- that a single user is responsible for this step, correct? A. Correct.") |

| | | |
|---|---|---|
| | | 3/11/15 Trial Tr., at 226:2-19 (Ed Tittel); *id.* at 231:7-24 ("Q. Is Dr. Carbonell correct, that a single user is transmitting this participant data from the Life360 servers to all of the phones in the circle? A. No, the server is doing the transmitting."). |
| | | 3/11/15 Trial Tr. at 141:7-13 (Alex Haro) ("nothing is ever transmitted to you unless you choose to go into the foreground. So it is only once you go into the foreground that your phone then asks the Life360 servers, hey, give me the latest information . . . . only at that moment where you have opened in the foreground do things get synced up and you learn about my location."); *id.* at 142:5-22 ("You can could also turn off GPS and location. . . .  If your phone is off, Life360 is not running, we can't do anything about it."); *id.* at 142:11-13 ("if you turn location off, then we just continue to stop working, we can't send location to Life360 servers at all"). |

Because no substantial evidence or legal authority supports AGIS' theory of infringement, Life360 is entitled to judgment as a matter of law.

At trial AGIS suggested that a family or circle can be considered a single user for purposes of direct infringement.  First, this argument is outside of AGIS' expert's report and no evidence was presented during trial.  Second, this theory is unsupported by the law, which requires actors who are not vicariously liable for each other's actions to meet the control-or-direction standard in order to be legally responsible for others' actions.  AGIS admitted that this is a "joint infringement" theory when Mr. Hanneman told the Court that "And so the single entity could be each…family.  For example, where -- you know, the classic one where the children are under the control and direction of their parents and the parents are vicariously liable for their actions." 3/10/15, Trial Tr., at 150:1-5.  Not only is this legally incorrect, but AGIS was required to identify any joint infringement theories in its infringement contentions as per the Scheduling Order.  *See* DE 31 ("Insofar as alleged direct infringement is based on joint acts of multiple parties, the role of each such party in the direct infringement must be described").  Third, AGIS introduced no substantial evidence of any single family or circle where all the claim steps were performed, let alone performed on each phone of each family or circle member when the claims so require.  Further, AGIS presented no evidence of any instructions by Life360 or

any user that, if followed, would cause performance of all claimed steps and, thus, direct infringement. *See, e.g., Acco Brands, Inc. v. ABA Locks Co.*, 501 F.3d. 1307 (Fed. Cir. 2007). JMOL in Life360's favor on these theories is warranted as well.

### 2. *Various Claim Steps are Not Performed by Any User*

"A method claim is directly infringed when someone practices every step of the patented method." *Ericsson, Inc. v. D-Link Sys.*, 773 F.3d 1201, 1219, 1221 (Fed. Cir. 2014) ("[T]he direct infringer must *actually* perform the steps in the method claim."). Thus, "failure to meet a single limitation is sufficient to negate infringement of the claim." *Nomos Corp. v. Brainlab USA, Inc.*, 357 F.3d 1364, 1367 n.1 (Fed Cir. 2004).

The following table shows the claim steps that were allegedly performed alongside exemplary unrebutted evidence that any use of Life360's mobile app will not meet the claim requirements.

| Claim(s) (& Patent) | Claim Step & Construction | Relevant Testimony |
|---|---|---|
| 7 ('728) 1 ('681) | "generating one or more symbols on the touch display screen" | 3/10/15 Trial Tr., at 71:19-22 ("Q:…I believe it was your testimony that this entire limitation is satisfied by an admin user, correct? A. Yes.") |
| | | *See also* 3/10/15 Trial Tr., at 71:23-72:1; 73:3-5 ("The symbols are placed by the users and by the software working in conjunction."). |
| | | 3/11/15 Trial Tr. at 208:19-25 (Ed Tittel) ("Q. What actually is generating the symbols representing the users on the phones? A. Any time we see graphics or information show up on the screen, be it of a handheld cellphone or on a computer, that is coming from the software, sending graphic instructions to the hardware and then the hardware lighting up little locations on the screen to make information appear.") |
| 7 ('728) 1 ('681) | "free and operator selected text messages" | 3/10/15 Trial Tr., at 74:6-7 ("I believe that there currently is only one type of check-in message offered by Life360"); 74:8-15; 75:19-22. |
| | | 3/11/15 Trial Tr. at 209:10-23 ("Neither of these buttons has a text message associated with it. It is purely a button. And furthermore, the text message that this button causes to be sent does not allow the user to make any sort of selection as to what the content of that message will be."). (Tittel). |

9

| | | 3/11/15 Trial Tr., at 160:5-18; 161:5-14 (Alex Haro). |
|---|---|---|
| 7 ('728)<br><br>1 ('681) | "providing initiating cellular phone calling software in each cellular phone that is activated by touching a symbol on the touch display that automatically initiates a cellular phone call using the stored cellular phone number to the participant represented by the symbol" | 3/10/15 Trial Tr., at 91:23-25 ("They touch a symbol, then they touch the call button, and then they confirm that that's indeed the call they want to place.")<br><br>3/10/15 Trial Tr., at 93:11-13 ("Well, by touching the symbol you are touching the call software switch because it's in the same location on the screen as the symbol.")<br><br>3/10/15 Trial Tr., at 93:21-94:2 ("A. When you hit the -- when you touch the soft switch corresponding to a particular user that you want to call, then you have options of whether you wanted to send a text message or call or do something else, and upon touching the call button, the Life360 software transmits the telephone number to")<br><br>*See also* 3/10/15 Trial Tr., at 94:11-14.<br><br>*See also* 3/11/15 Trial Tr., at 156:19-157:6 (Alex Haro)<br><br>3/10/15 Novick Dep. Des., at 111:08-14 ("I think you'd have to pick a person, and then there is a ribbon that shows up that includes the ability to call. If you click on that button, it opens up the phone dialer, and you can click on the phone dialer to call the other person.")<br><br>Dr. Carbonell's opinion is also based on a false understanding of the Court's claim construction. 3/10/15 Trial Tr., at 92:13-14 ("it's consistent what the Court's notion of automatic").  But the Court never construed this term. |
| 7 ('728)<br><br>1 ('681) | "generating a geographical location chart on said display screen…" | 3/10/15 Trial Tr., at 95:17-19 (agreeing that "the Life360 source code directly uses latitude and longitude coordinates to calculate where to display the symbol of each member of the circle of the map").<br><br>3/10/15 Trial Tr., at 71:19-22 ("Q:…I believe it was your testimony that this entire limitation is satisfied by an admin user, correct? A. Yes.") |

| | | |
|---|---|---|
| | | *See also* 3/10/15 Trial Tr., at 71:23-72:1; 73:3-5 ("The symbols are placed by the users and by the software working in conjunction.").<br><br>3/11/15 Trial Tr., at 216:3-7 (Ed Tittel) ("the user isn't generating anything on the screen, it's the software and the hardware working together to generate something on the screen."). |
| 1 ('681) | "using software to create new or modify old symbols and associate the symbol to a new unused soft switch or a renamed existing soft switch and then downloading the new or renamed soft switch and the associated symbol to the cell phone and remote cell phone(s) so that the new or renamed soft switch and associated symbol can be used on the cell phone" | 3/10/15 Trial Tr., at 96:11-14 ("No, a symbol is what you see and the soft switch is a functionality associated with that symbol. So the soft switch is the data and software which is invoked upon touching the symbol on a touch screen.") (contravenes Court's Markman Order).<br><br>3/11/15 Trial Tr., at 216:19-219:8 ("the language of the claim -- of the construction actually requires that there be a function or action associated with the virtually displayed switch, which is our symbol on the screen (Ed Tittel). |
| 1 ('954) | "a software application program and database that permits each cell phone user to continuously know each other cell phone user's … status" | Dr. Carbonell presented no evidence concerning "continuous" transmissions, and instead incorrectly stated that continuously means "periodically."  3/10/15 Trial Tr., at 16:16-17. |
| 1 ('954) | "displaying on each cell phone display one or more symbols representing the users in the network having similarly equipped cell phones" | 3/10/15 Trial Tr., at 109:13-16 ("Q: Would you agree with me that the software that does the actual act of displaying is part of the Life360 app? A. The software that draws the symbols in a particular location, yes, of course.") |
| 1 ('954) | "continuously know each other cell phone user's…status" | The "status" identified by Carbonell for this claim is not transmitted "continuously" or even "periodically".<br><br>3/10/15 Trial Tr., at 50:1-3 ("The status is whether they are currently checked in, how much time has elapsed since the last update and so forth").<br><br>3/11/15 Trial Tr., at 162:4-13 (Alex Haro) |
| 1 ('954) | "transmitting from a remote | 3/10/15 Trial Tr., at 111:22-24 ("Q. You're not |

| | | network server that can communicate with each cell phone/PDA in said communications network additional maps to each user's cell phone, …" | aware of Life360 itself having a server that has maps on it, correct? A. That's correct")

*See also* 3/10/15 Trial Tr., at 111:25-112:24.

3/11/15 Trial Tr. at 138:13-19 (Alex Haro) ("A. So all of the maps that Life360 use are already provided by the phone. We actually don't implement any apps ourselves. We are just using what Google gives us, what iPhone gives us, what Windows gives us. We are only using the maps provided."). |
|---|---|---|---|
| 1 ('954) | "define public and private peer to peer, networks" | 3/10/15 Trial Tr., at 117:5-14 ("Q. Okay. Is there any way that a member of the general public can join a Life360 circle that is not invited? A. Well, all the access is through invitation, so a member of the public would have to meet a friend, you would have to already know them, or they would have to request to you can I access your network and then you have to say yes, using invitation. Q. Right. I would have to invite those people specifically, correct? A. That's right.").

3/10/15 Trial Tr., at 117:21-22; 119:7-10.

3/10/15 Trial Tr. at 115:22-116:6 (no evidence that a circle has been set-up through a website, and a phone call made within that circle).

3/9/15 Trial Tr. at 167:5-15 ("a private group is a group that I own, that I create, and that only people that can be in that group is if I invite them to be in that group. A public group is a group, is a list of groups that are published by the server so that people could go and join those groups without somebody specifically inviting them") (Sandel Blackwell, President of AGIS)

168:10-15; Trial Ex. DTX-534 |
| 1 ('954) | "communicating additional maps from a remote network server that can communicate with each cell phone/PDA in said communications network" | 3/9/15 Trial Tr., at 111:22-24 ("Q. You're not aware of Life360 itself having a server that has maps on it, correct? A. That's correct")

*See also* 3/10/15 Trial Tr., at 111:25-112:24; 113:1-14; 114:17-24.

3/11/15 Trial Tr. at 138:13-19 (Alex Haro) ("A. So all of the maps that Life360 use are already provided by the phone. We actually don't implement any apps ourselves. We are just using |

| | | what Google gives us, what iPhone gives us, what Windows gives us. We are only using the maps provided."). |
|---|---|---|
| 5 ('441) | "establishing …a communications network among the communication devices whereby only the network participants with a common interest are capable of exchanging and displaying identity data, location data, status data" | 3/10/15 Trial Tr., at 122:22-23 ("Life360 does not have a search capability for existing circles, at least not one I'm aware of")<br><br>3/10/15 Trial Tr., at 123:22-124:7 ("But he cannot use it without the admin user inviting")<br><br>3/10/15 Trial Tr., at 125:11-17 ("But to be specific, I cannot create an open network that people can join unilaterally, because they share an interest that I've identified? A. Using the word "unilaterally," you're correct. You can start one and then you can tell people to let you know if they wanted to join, and then you can let them join, but it requires an extra step.")<br><br>3/11/15 Trial Tr., at 229:18-23 ("There's no mechanism in the Life360 environment for collecting, storing, and using common interest data. There's just nothing built in to either ask for, acquire, or deal with that kind of information to make decisions about who gets included on communications or who's involved in circles and that kind of thing"). |
| 5 ('441) | "establishing, on the private remote server, a common interest network comprising every participant having common interest data matching the common interest data of the requesting participant" | 3/10/15 Trial Tr., at 122:22-23 ("Life360 does not have a search capability for existing circles, at least not one I'm aware of")<br><br>3/10/15 Trial Tr., at 123:22-124:7 ("But he cannot use it without the admin user inviting")<br><br>3/10/15 Trial Tr., at 125:11-17 ("But to be specific, I cannot create an open network that people can join unilaterally, because they share an interest that I've identified? A. Using the word "unilaterally," you're correct. You can start one and then you can tell people to let you know if they wanted to join, and then you can let them join, but it requires an extra step.")<br><br>3/11/15 Trial Tr., at 229:18-23 ("There's no mechanism in the Life360 environment for collecting, storing, and using common interest data. There's just nothing built in to either ask for, |

| | | acquire, or deal with that kind of information to make decisions about who gets included on communications or who's involved in circles and that kind of thing") (Tittel). |
|---|---|---|
| 5 ('441) | "each time network participant data is received the private remote server automatically transmitting to each of the other devices in IP communications with the server with the same common interest, at least the identity and, location data of each of the participants, in the common interest network without any selection criteria or manual input of relationship data" | 3/10/15 Trial Tr., at 125:23-126:6 (stating that a single user performs this step) <br><br> 3/11/15 Trial Tr., at 231:7-24 ("Q. Is Dr. Carbonell correct, that a single user is transmitting this participant data from the Life360 servers to all of the phones in the circle? A. No, the server is doing the transmitting.") (Ed Tittel) |
| 5 ('441) | "displaying, on the touch display screen of each communication device of each participant in the common interest network, at least the identity data and the location data of each participant in the common interest network" | 3/10/15 Trial Tr., at 126:16-127:6 (stating that a single administrative user performs this step, but then agreeing that "the Life360 software" does the displaying). <br><br> 3/11/15 Trial Tr., at 226:20-227:19 (Ed Tittel) |

Because no substantial evidence supports AGIS' infringement allegations as to these claim steps, Life360 is entitled to judgment as a matter of law.

Additionally, Life360 is entitled to judgment as a matter of law because AGIS did not address and has not presented any evidence with respect to each and every claim element, as was its burden. Moreover, in this case, which involves complex technology beyond the capacity of a lay person, AGIS needed expert testimony explaining how each claim element was met. *See, e.g., Centricut, LLC v. Esab Grp., Inc.*, 390 F.3d 1361, 1370 (Fed. Cir. 2004) ("'typically' <u>expert testimony</u> will be necessary in cases involving complex technology."); *Alexsam, Inc. v. IDT Corp.*, 715 F.3d 1336, 1348 (Fed. Cir. 2013) (explaining that even if the facts are allegedly in the record, expert testimony is needed to explain the fact to the fact finder when the technology is

complex).  For example, AGIS presented no evidence or expert testimony to the jury comparing at least the following claim elements to the accused Life360 app:

| 7 ('728) | "7. A method of establishing a cellular phone communication network for designated participants, each having a similarly equipped cellular phone that includes voice communication, free and operator selected text messages, photograph and video, a CPU, a GPS navigation system and a touch screen display comprising the steps of:"<br><br>3/10/15 Trial Tr., at 37:19-38-3 (reading the preamble but not comparing it to the Life360 app) |
|---|---|
| 1 ('681) | "1. A method of establishing a cellular phone communication network for designated participants, each having a similarly equipped cellular phone that includes the capability for: voice communications, free and operator selected text messages data exchange, photograph and video capture and transmissions, a CPU, a GPS navigation system and a touch screen display comprising the steps of:"<br><br>3/10/15 Trial Tr., at 37:19-38-5. |
| 1 ('954) | "1. A method of providing a cellular phone communication network for designated participating users, each user having a similarly equipped PDA/cell phone that includes a CPU and a GPS navigational system for a touch screen display:"<br><br>[never addressed] |
| 5 (441) | "4. A method of communicating among a group of participants each having a communication device that includes a touch display screen, a global positioning system, and advanced communications software, comprising the steps of"<br><br>[never addressed] |
| 5 ('441) | "exchanging and displaying…status data"<br><br>[never addressed] |
| 7 (728)<br><br>1 (681) | "storing in each of the participant cellular phones one or more cellular phone telephone numbers"<br><br>3/10/15 Trial Tr., at 42:21-43:5 (skipping this claim limitation and noting that the claim "does not require anything else"). |
| 1 (681) | "associate the symbol to a new unused soft switch or a renamed existing soft switch and then downloading the new or renamed soft switch and the associated symbol to the cell phone and remote cell phone(s) so that the new or renamed soft switch and associated symbol can be used on the cell phone"<br><br>3/10/15 Trial Tr., at 46:16-21 (including entire analysis of the full limitation of step (e) of the '681 patent, and not identifying what "associate" is, or addressing the limitation "new unused soft switch or a renamed existing soft switch") |
| 1 ('954) | "said server including a database that contains additional maps not available on |

|  | each user's cell phone database that can be downloaded by each cell phone/PDA by communicating with the server"<br><br>"said server including a database that contains additional maps not available on each user's cell phone database that are automatically downloaded to each cell phone/PDA through communication with the server"<br><br>3/10/15 Trial Tr., at 53:6-23 (including entire opinion for two steps of the '954 patent, and not mentioning the above specific limitations) |
| 5 ('441) | "having a pre-stored address contained in the ACS software"<br><br>3/10/15 Trial Tr., at 59:11-60:3 (addressing entire claim step without mentioning the above limitation) |
| 5 ('441) | "every participant having common interest data matching the common interest data of the requesting participant"<br><br>3/10/15 Trial Tr., at 60:6-61:15 (failing to identify "common interest data," or any "matching" process) |

Accordingly, no reasonable jury could find that any of the above claim elements are met by the accused Life360 app, and JMOL is warranted.

### 3.  Life360 did not have "specific intent" to induce its users to infringe

Even beyond the fact that no evidence exists that a single actor could perform the asserted claims, AGIS' theory of induced infringement necessarily fails because 35 U.S.C. § 271(b) requires proof that the alleged infringer "knew or should have known his actions would induce actual infringements" and that the alleged infringer specifically intended to encourage another party to directly infringe. *See Global-Tech Appliances, Inc. v. SEB S.A.,* 131 S. Ct. 2060, 2068 (2011); *DSU Medical Corp. v. JMS Co., Ltd.*, 471 F.3d 1293, 1304 (Fed. Cir. 2006).  Mere knowledge of the acts that are alleged to be infringing is not enough to show the requisite specific intent.  *Id.*  The fact that an alleged infringer has a reasonable non-infringement and/or invalidity position with respect to the asserted patents can establish a lack of specific intent. *COMMIL USA, LLC v. Cisco Sys., Inc.*, 720 F. 3d 1361, 1367-38 (Fed. Cir. 2013) ("Thus, a good-faith belief of invalidity is evidence that may negate the specific intent to encourage another's infringement, which is required for induced infringement.").  AGIS has failed to provide legally sufficient evidence showing that Life360 specifically intended for its users to infringe.  The only evidence is to the contrary—that Life360 believed that it did not infringe and that the patents are all invalid.  3/11/15 Trial Tr., at 109:18-19 (Hulls, in response to questioning

from AGIS counsel, stated: "When we actually reviewed with the lawyers, they felt we are not infringing, these aren't valid."). In deciding Life360's oral Motion for a Judgment as a Matter of Law for no willful infringement, the Court stated that Life360 established that it has a reasonable invalidity and non-infringement positions. 3/11/15 Trial Tr., at 147:5-6 ("Life360 has raised both legitimate defenses to infringement and credible invalidity arguments"). Accordingly, for essentially the same reasons the Court granted JMOL of no willfulness in Life360's favor, AGIS's failure of proof of specific intent would likewise preclude any reasonable fact finder from finding Life360 liable for active inducement.

### 4. Life360 did not contribute to infringement

Although it was required of AGIS under 35 U.S.C. § 271(c) to properly assert a theory of contributory infringement, AGIS did not contend that the Life360 product has no substantial non-infringing use, nor did it present any legally sufficient evidence that Life360 offered to sell the Life360 app "knowing the same to be especially made or especially adapted for use in an infringement of such patent." As discussed above with respect to "specific intent" for inducement under 35 § 271(b), contributory infringement therefore requires knowledge of the patent and of any direct infringement that results from the accused contributory conduct. *Global-Tech*, 131 S. Ct. at 2068. For at least the same reasons noted above that AGIS failed to prove the scienter requirement for active inducement, it likewise failed to prove the scienter requirement for contributory infringement. Further, AGIS introduced no evidence to show that the Life360 app has no substantial non-infringing uses. In fact, the evidence shows that users of the app can use it in substantial ways that do not infringe. The many substantial uses and aspects of the app, as accused, do not infringe for the reasons detailed herein, and thus the accused Life360 app has extensive—indeed, total—substantial noninfringing uses. *See also* 3/11/15 Trial Tr., at 150:14-16 ("I find that Life360's non-infringement position that AGIS cannot demonstrate that a single user performs all of the asserted method claims is reasonable"). Accordingly, Life360 is entitled to judgment as a matter of law of no contributory infringement.

### 5. Life360 did not directly infringe the patents by "testing" the Life360 app

AGIS' only argument that Life360 directly infringes the asserted patents is that Life360 employees infringe by testing the app. AGIS has not presented legally sufficient evidence to support this theory and, in fact, has provided no evidence that any employee has performed each

and every claim limitation.  AGIS only presented evidence that a single Life360 employee, Amy Ranbarger, *has* tested the app, but did not present any evidence that the Ms. Ranbarger performed any of the claim steps, not to mention each and every claim step, of all of the asserted claims during the relevant time period.  3/10/15 Ranbarger Dep. Des., at 71:15-18 ("Q. Are those the only two circles you have? A. I have others, but they are mostly for testing purposes."); 72:09-72:17 (testing for UI purposes only); 56:24-57:1 (never used the "call" feature).  Even in the depositions (and designations played in trial), no further questions were asked concerning Ms. Ranbarger's testing.  Ms. Ranbarger testified that her boyfriend, and his father and uncle, were in her personal (*i.e.*, not as part of her job at Life360) "Napa" circle—yet no evidence of any actions taken on those users' phones was provided by AGIS.  *Id*. at 71:25-72:06.  AGIS' argument concerning direct infringement by testing thus does not identify a single step of a single asserted claim, let alone all steps of all claims.   Accordingly, Life360 is entitled to judgment as a matter of law.

   B.  The Asserted Claims are Invalid as a Matter of Law

      *1.  Various Asserted Claims Fail to Satisfy the Written Description, Enablement, and Definiteness Requirements of Section 112*

   Patent applications must include "a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art …to make and use the same."  35 U.S.C. § 112.  This ensures "that the public will know what it is and that [the inventor] has truly made the claimed invention."  *Abbvie Deutschland GMBH v. Janssen Biotech, Inc.*, 759 F. 3d 1285 (Fed. Cir. 2014).  Claims must convey "that the inventor had possession of the claimed subject matter as of the filing date."  *Ariad Pharm., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010).

      Patents must also "particularly point[] out and distinctly claim[] the subject matter which the applicant regards as his invention."  35 U.S.C. § 112.  The Supreme Court held that "a patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention."  *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2124 (2014).  The presence of "two conflicting interpretations" of a claim term "constitutes clear and convincing evidence the term is not 'precise enough to afford clear notice of what is claimed' and is, thus, invalid for indefiniteness."  *Atlas IP, LLC v. St. Jude Med., Inc.*, No. 14-

21006-CIV, 2014 WL 3764129, at *11 (S.D. Fla. July 30, 2014) (quoting *Nautilus*, 134 S. Ct. at 2129).

> a. The "excluding a website or web browser" and "without any selection criteria or manual input of relationship data" requirements of claim 4 of the '441 Patent are invalid for being negative limitations having no supporting written description

To adequately support a "negative limitation" that excludes a particular element from a claim, the written description must explain why the element would be excluded. *Santarus, Inc. v. Par Pharmaceutical, Inc.*, 694 F.3d 1344, 1351 (Fed. Cir. 2012) (upholding a negative limitation where the specification explained the disadvantages of the excluded element); *In re Bimeda Research & Development Ltd.*, 724 F.3d 1320, 1322-24 (Fed. Cir. 2013) (rejecting a claim excluding a species even though the specification supported the exclusion of the broader genus). The adequacy of a written description is routinely decided on summary judgment. *E.g., PowerOasis, Inc. v. T-Mobile USA, Inc.*, 522 F.3d 1299, 1307 (Fed. Cir. 2008).

Claim 4 of the '441 Patent (from which asserted claim 5 depends) requires "establishing, over a private remote server *excluding a website or a web browser*, a communications network among the communication devices…" The specification does not disclose establishing a communications network with or without "a website or web browser," nor does it explain why a website or web browser would be excluded. This limitation was added during prosecution and lacks support in the original claims (Trial Ex. PTX-008, at Amendment dated 10/7/11). *See TurboCare Div. of Demag Delaval v. General Electric*, 264 F. 3d 1111, 1118 (Fed. Cir. 2001) ("[N]ew claims…must find support in the original specification.").

The '441 Patent only mentions the term "web" three times and, even then, never mentions the term "web browser." See Trial Ex. PTX-904, at 5:45-48 ("a fixed facility's website"); *id.* at 10:16-17 ("Myspace or similar web dating URL"); *id.* at 11:27-31 ("the web site associated with the URL"). These references to the "web" all concern the ability of a device to visit a website by following a URL, but do not disclose whether a web browser or website is used to establish a network. *Id.* This type of "negative" claiming is not permitted under § 112 without adequate support. *Santarus*, 694 F.3d at 1351; *Bimeda*, 724 F.3d at 1322-24; *Tse v. Google, Inc.*, No. C 13-0194 SI, 2013 WL 6502478, at *6 (N.D. Cal. Dec. 11, 2013) aff'd, 570 F. App'x 941 (Fed. Cir. 2014).

Life360 introduced clear and convincing evidence that the specification does not sufficiently disclose excluding a website or web browser . 3/12/15 Trial Tr., morning. AGIS has not rebutted this fact. The fact that one skilled in the art could have excluded a website or web browser is irrelevant to the analysis. *See Brooke Group* Ltd., 509 U.S. at 242. The only time the specification mentions a "website" indicates that the "advanced communication software (ACS)" can visit a website, or at least link to one. Trial Ex. PTX-904, at 11:25-31. A "private remote server" does not necessarily exclude the web.

In *Google*, the patentee added claim language during prosecution requiring software to be provided "without" a payment taking place. *Google*, 2013 WL 6502478, at *4. The written description mentioned a payment "in the context of affirmatively causing a payment to be made," but did not otherwise discuss payments. *Id.* The court, relying on *Santarus*, found the written description inadequate because it failed to specifically describe not requiring a payment. *Id.* at 6. Nor did it describe any disadvantages of requiring a payment. *Id.*; *but see Santarus*, 694 F.3d at 1351 (finding the claimed exclusion of a compound to be adequately supported because the specification described a reason for the exclusion).

Here, as in Google, the written description of the '441 Patent does not specifically disclose that a website or web browser would not be used to establish a network, nor does it list alternative methods for doing so. The specification only describes software used for performing tasks including, among others, establishing networks. Trial Ex. PTX-904, at 1:16-22; 8:6-18. The written description does not suggest whether this software "black box" includes a web browser, but does state that a user can "go to the fixed facility's website" from within the software. Trial Ex. PTX-904, at 5:45-48.

Claim 4 of the '441 Patent also requires "transmitting…at least the identity and, location data of each of the participants…*without any selection criteria or manual input of relationship data*," which was added during prosecution. Trial Ex. PTX-904; PTX-008. The written description does not mention the terms "selection criteria" *or* "relationship data," nor does it state that these elements should specifically be excluded for the transmission of participant data. The specification includes only vague references to "dating criteria" and "criteria such as time, speed, distance traveled," but does not suggest that such "criteria" would or would not be selected. *See* Trial Ex. PTX-904, at 7:41-43; 10:20-23; 10:39-46; Fig. 3a. The term "selection" is only used in the context of selecting phones to poll, selecting different map types, and

"presenting different potential operator selections." *Id.* at 8:12-14; 8:30. Neither the terms "selection" nor "criteria" are used to describe how data is transmitted.

Nowhere is "relationship data" mentioned much less defined. The term "relationship" is only used to describe how users can be "polled." *Id.* at 2:35-36 ("a common interest or relationship"); 9:61 ("establishing social relationships"); 12:2 ("establish selectable anonymous relationships").

Even if these terms were *positively* claimed, the written description would be inadequate. Because they are claimed in the *negative*, the requirement is certainly not met. This limitation is invalid under § 112. *See Santarus, Inc.*, 694 F.3d at 1351.

> b. The "free and operator selected text messages" requirement of claim 7 of the '728 Patent is invalid for lacking adequate written description and for being indefinite

Claim 7 of the '728 Patent requires multiple participants in a network that each have "a cellular phone that includes … *free and operator selected text messages*, photograph and video." The written description of the '728 Patent does not include a single recitation of the terms "free and operator selected messages," "free," or "operator selected." Trial Ex. PTX-901. This incomprehensible limitation was added to the claims during prosecution. The term "free and operator selected text messages" is therefore indefinite and not adequately disclosed.

The disclosure must describe *both* "free" and "operator selected" text messages to be adequate. *See Ariad*, 598 F.3d at 1351. The general recitation of "text messages" does not support these specific *types* of messages. *See Stored Value Solutions, Inc. v. Card Activation Technologies, Inc.*, 2012 WL 6097674, *7-8 (Fed. Cir. 2012) (affirming summary judgment of invalidity for claims requiring three types of "authorization codes," but where only general references to "authorization codes" were disclosed). While the broad genus of "text messages" is disclosed by the specification, the species "free" and "operator selected" text messages are not. *See Novozymes A/S v. Dupont Nutrition Biosciences APS,* 723 F.3d 1336, 1346 (Fed. Cir. 2013).

The notion that both "free" and "operator selected" text messages could be extrapolated from the generic description of "text messages" is erroneous because "a description that merely renders the invention obvious does not satisfy the requirement." *See Ariad*, 598 F.3d at 1352; *see also TurboCare*, 264 F.3d at 1118. This argument is further confused by the fact that an "operator selected" text message can also be "free." For example, claim 1of the '681 Patent recites "*free, operator* selected text messages." PTX-902.

The specification provides no reference to a "preformatted message" or a "list." Trial Ex. PTX-901. An "emergency message" cannot be reasonably interpreted as an "operator selected text message" or even a "text message." The "emergency message" mentioned in the '728 Patent is a "digital message that …remotely activate[s] a program in the remote cellular phone to play a recorded audio file to announce an emergency." Trial Ex. PTX-901, at 11:49-55; 5:61-64.[3]

Further, because "free" could be understood to mean "free of cost," this negative limitation is also unsupported. *See Google, Inc.*, 2013 WL 6502478, at *4 (lack of support for a no-cost limitation); Trial Ex., at PTX-901. Yet AGIS insists without support, or having offered a construction, that this term refers to messages that are "freely typed." The "free of cost" interpretation is supported by the colloquial use of "free text messages" in the "mobile app" industry.[4] These conflicting interpretations constitute clear and convincing evidence that the term is indefinite. *Atlas IP*, 2014 WL 3764129, at *11.

Because Life360 has presented clear and convincing evidence, through the unrebutted testimony of Dr. Alexander, that the written description fails to disclose "free" and "operator selected" text messages, or provide "reasonably certainty" as to the meaning, claim 7 of the '728 Patent is invalid for indefiniteness and lack of an adequate written description. *See* 3/12/15 Trial Tr., morning.

### 2. The Asserted Claims are Obvious

A claim is invalid when the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious to one of ordinary skill in the art at the time the invention was made. 35 U.S.C. § 103. "[A] patent for a combination which only unites old elements with no change in their respective functions … obviously withdraws what already is known into the field of its monopoly and diminishes the resources available to skillful men. This is a principal reason for declining to allow patents for what is obvious." *KSR Int'l Co v. Teleflix Inc.*, 550 U.S. 398, 415-18 (2007).

Courts should take an "expansive and flexible" approach in determining obviousness, taking into account "the inferences and creative steps that a person of ordinary skill in the art would employ." *Id.* at 415-18. "If a person of ordinary skill can implement a predictable

---

[3] This "digital message" is described to be a data message (not a text message) sent using the SMS or TCP/IP protocol. Trial Ex. PTX-901, at 10:1-6; 6:34-36.

variation [of the prior art], § 103 likely bars its patentability." *Id.* at 4017. "[A]ny need or problem known in the field of endeavor at the time of invention and addressed by the patent can provide a reason for combining the elements in the manner claimed." *Id.* at 420.

Clear, convincing, and unrebutted evidence was provided that U.S. Patent No. 6,292,747 to Amro (DTX-372), either alone or in combination with Applicant Admitted Prior Art and/or the knowledge of one skilled in the art[5], renders claim 7 of the '728 Patent, claim 1 of the '681 Patent, and claim 5 of the '441 Patent obvious and/or anticipated. 3/12/15 Trial Tr., morning. AGIS has not sufficiently rebutted Life360's evidence.

Clear, convincing, and unrebutted evidence was provided that U.S. Patent No. 8,139,514 to Weber (DTX-372), either alone or in combination with Applicant Admitted Prior Art, renders obvious claim 1 of the '681 Patent obvious and/or anticipated. No evidence proffered by AGIS suffices to allow a reasonable fact finder to conclude otherwise.

The following table shows that each and every claim was either admittedly present in the prior art according to AGIS, or presents otherwise undisputed evidence showing that each of the claim steps were met:

| Claim 7, '728 Patent | Anticipated and/or obvious in view of Amro (DTX-372), taken alone or in combination with Applicant Admitted Prior Art and/or the knowledge of one skilled in the art. 3/12/15 Trial Tr. (morning) |
| --- | --- |
| Claim 1, '681 Patent | Anticipated and/or obvious in view of Amro (DTX-372), taken alone or in combination with Applicant Admitted Prior Art and/or the knowledge of one skilled in the art. 3/12/15 Trial Tr. (morning).<br><br>Anticipated and/or obvious in view of Weber (DTX-372), taken alone or in combination with Applicant Admitted Prior Art and/or the knowledge of one skilled in the art. 3/12/15 Trial Tr. (morning) |
| Claim 5, '441 Patent | Anticipated and/or obvious in view of Amro (DTX-372), taken alone or in combination with Applicant Admitted Prior Art and/or the |

---

[5] Life360 submitted evidence showing the state-of-the-art prior to 2004 including the Gate5 system (DTX-369), the Benefon ESC! documentation (DTX-368), Nokia's U.S. Patent No. 6,518,957 (DTX-367), U.S. Patent No. 7,330,112 to Emigh (DTX-373), and Applicant Admitted Prior Art from the '728 Patent (PTX-901 at 1:31-60).

| | knowledge of one skilled in the art. 3/12/15 Trial Tr. (morning) |
|---|---|

C.  AGIS is Not Entitled to its Claimed Damages as a Matter of Law

The Federal Circuit has emphasized that damages theories for reasonable royalties require "sound economic proof" "to prevent the hypothetical from lapsing into pure speculation." *Grain Processing Corp. v. American Maize-Products Co.*, 185 F.3d 1341, 1350 (Fed. Cir. 1999); *accord ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 869 (Fed. Cir. 2010) ("[A] reasonable royalty analysis requires a court to hypothesize, not to speculate.").

AGIS offered at trial, via its expert Melissa Bennis, a theory of damages such that Life360 would owe $0.25 per user of the app, depending on which combinations of patents are found to be infringed, regardless of whether the user met an admitted requirement of infringement, namely participation in a circle with another user.  3/10/15 Trial Tr., at 139:3-5. Moreover, AGIS presented no evidence that any single user performed all the claimed steps, let alone evidence to establish that *all* users performed all the claimed steps, it is manifestly unreasonable to calculate damages as to all users.   AGIS did not even attempt to provide the jury with any evidence to guide the jury to reasonably infer a percentage of users/circles that *might* have performed the entire infringing method, and thus require payment of a royalty.

Damages must "compensate for the [accused] infringement."  35 U.S.C. § 284.  As noted above, "[a] method claim is directly infringed when someone practices every step of the patented method."  *Ericsson*, 773 F.3d at 1219, 1221 (Fed. Cir. 2014) ("[T]he direct infringer must *actually* perform the steps in the method claim.").  Consequently, damages do not "compensate" for infringement in instances where no performance of the entire claimed method occurred.  *See IP Innovation L.L.C. v. Red Hat, Inc.*, No. 2:07-cv-447, ECF No. 154, at 3-4 (E.D. Tex. Mar. 2, 2010) (excluding expert testimony because "Mr. Gemini made no effort to factor out of his proffered royalty base these products which do not even feature the claimed invention.  Once again, this blatant oversight shows that Mr. Gemini did not use the type of reliable economic principles and methods required by Rule 702 for an economic damages expert."); *Huck Mfg. Co. v. Textron, Inc.,* No. 35956, 1975 U.S. Dist. LEXIS 12539, at *76 (E.D. Mich. May 2, 1975) ("For a person who uses a device [that is capable of a non-infringing use], infringement is determined by the use to which the invention is actually put.").

Because AGIS failed to introduce any competent evidence to prove that it is entitled to damages associated with *every* Life360 user, the only valid evidence of the amount of damages came from Life360's expert, who presented the jury with ample—and factually supported—bases to find that the proper measure of damages, if any, is in the range of $26,500 to $75,000-$125,000, based on a percentage of revenue earned during the pertinent damages period.[6] 3/12/15 Trial Tr., morning; *See Brooke Group Ltd*, 509 U.S. at 242; *Shockley v. Arcan*, 248 F.3d 1349, 1362 (Fed. Cir. 2001) ("This court . . . has a 'maximum recovery rule' which remits an excessive jury award to the highest amount the jury could properly have awarded based on the relevant evidence.").   To the extent any judgment is entered against Life360 in this case, judgment as a matter of law in warranted that the damages for such an adverse judgment must be in the range of $26,500 for reasonable royalty, or up to $125,000 for a lump sum theory.

---

[6] Supporting evidence for this calculation may be found, for example at 3/12/2015 Trial Tr., at AM proceedings.

Dated: March 12, 2015                    Respectfully Submitted,

                                         /s/ *Kent E. Baldauf, Jr.*

                                         Kent E. Baldauf, Jr. (PA I.D. No.: 70793)
                                         kbaldaufjr@webblaw.com
                                         Cecilia R. Dickson (PA I.D. No.: 89348)
                                         cdickson@webblaw.com
                                         Bryan P. Clark (PA I.D. No.: 205708)
                                         bclark@webblaw.com
                                         James J. Bosco, Jr. (PA I.D. No.: 203896)
                                         jbosco@webblaw.com
                                         Christian D. Ehret (PA I.D. No.: 311984)
                                         cehret@webblaw.com

                                         The Webb Law Firm
                                         One Gateway Center
                                         420 Ft. Duquesne Blvd., Suite 1200
                                         Pittsburgh, Pennsylvania
                                         Telephone: (412) 471-8815
                                         Facsimile: (412) 471-4049

                                         Eric C. Christu (Fla. Bar No. 434647)
                                         echristu@shutts.com
                                         Daniel J. Barsky (Fla. Bar No. 0025713)
                                         Shutts & Bowen LLP
                                         1100 CityPlace Tower
                                         525 Pkeechobee Boulevard
                                         West Palm Beach, FL 33401
                                         Telephone: (661) 650-8518
                                         Facsimile: (561) 822.5527

                                         *Counsel for Defendant LIFE360, Inc.*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on the 12th day of March, 2015, I filed the foregoing via CM/ECF,

which caused a copy of the foregoing to be served upon the following via electronic mail:

Ury Fischer, Esq.
ufischer@lottfischer.com
Adam Diamond, Esq.
adiamond@lottfischer.com
Lott & Fischer, PL
355 Alhambra Circle
Suite 1100
Coral Gables, FL 33134
305-448-7089(ph/305-446-6191(fax)

Mark Hannemann, Esq.
mhannemann@kenyon.com
Matthew C. Berkowitz, Esq.
mberkowitz@kenyon.com
Thomas R. Makin, Esq.
tmakin@kenyon.com
Vincent J. Rubino, III, Esq.
vrubino@kenyon.com
George E. Badenoch, Esq.
gbadenoch@kenyon.com
Corey J. Betker, Esq.
cbetker@kenyon.com
Alessandra Carcaterra, Esq.
acarcaterra@kenyon.com
Rose Cordero Prey, Esq.
rcordero@kenyon.com
Kenyon & Kenyon, LLP
One Broadway
New York, NY 10004-1007
212-425-7200 (ph) / 212-425-5288

                                    s/ *Daniel J. Barsky*_____
                                    Counsel for Defendant
                                    Life360, Inc.